**Bernice F. STARK, Plaintiff-Appellant,**

v.

**Caspar W. WEINBERGER (Successor to Elliot Richardson), Defendant-Appellee.**

**No. 73–1993.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1974.

Decided May 31, 1974.

---

Richard M. Kates, Chicago, Ill., for plaintiff-appellant.

Kathryn H. Baldwin and Stanton R. Koppel, Attys., Civil Div., Appellate Section, Dept. of Justice, Washington, D. C., James R. Thompson, U. S. Atty., Chicago, Ill., for defendant-appellee.

Before PELL, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

Plaintiff has been afflicted with scleroderma,[1] a progressive, incurable disease, since the late 1930's. She claims the right to receive disability benefits since 1971, the year in which she first applied for relief under the Social Security Act.[2] It is perfectly clear that she was then—and indeed for many years had been—disabled within the meaning of the Act. However, because of the special earnings requirement of the statute,[3] the Secretary determined that she must establish a period of disability commencing no later than December 31, 1950. Plaintiff's failure to apply more promptly (which is attributed to lack of knowledge of her rights) thus not only limited the amount of her claim but also created unusually difficult problems of proof. The administrative law judge found in her favor, but the Appeals Council reversed.[4] Our review of the entire record convinces us that the original determination of disability should be reinstated.

The Secretary has advanced two primary bases to support the decision of the Appeals Council. First is that plaintiff failed to satisfy her burden of proving a disability. Second is that the decision rests upon certain items of evidence which we should accept as substantial. Before evaluating the bases for the Secretary's action, we shall briefly describe the uncontradicted evidence supporting plaintiff's claim. This evidence includes plaintiff's testimony, which the administrative law judge

---

[1]. Scleroderma has been defined as a chronic mesenchymal disease of undetermined origin, characterized by connective tissue proliferation in the dermis and in many internal organs. The onset is insidious, with stiffness of the hands, sweating of the hands and feet, and Raynaud's phenomenon. The skin eventually becomes hard, thick and glossy, and the fingers and toes become fixed. Gradually the entire integument becomes involved, and ulcerations, pigmentation, and calcification may occur. Dysphagia, disturbed gastrointestinal motility, respiratory embarrassment, pneumonia and heart failure and renal involvement are due to connective tissue proliferation of the viscera. The condition is usually slowly progressive over many years, and death is usually due to renal or cardiac failure or to sepsis. Treatment is symptomatic and supportive. The Handbook of Medical Treatment 386 (12th ed. 1970).

[2]. 42 U.S.C. §§ 416 & 423. Plaintiff's application was filed on July 29, 1971. Under the provisions of 20 C.F.R. § 404.307(a) (1973) she will not receive benefits for any period earlier than July 29, 1971.

[3]. 42 U.S.C. § 416(i)(3)(B)(i).

[4]. The case was before the Appeals Council twice. After it first reversed the administrative law judge, plaintiff sought review in the district court pursuant to 42 U.S.C. § 405(g). That court remanded the case to the Secretary to consider additional evidence. After this evidence was received, the Appeals Council reaffirmed its prior decision. The district court then entered summary judgment for the Secretary. The case is before us on an appeal from that judgment.

credited; medical records; affidavits of plaintiff, some of her former co-workers and a doctor; a letter from her treating physician; and medical treatises describing scleroderma and Raynaud's phenomenon.

## I.

Except for the dispute over the date when plaintiff's affliction became disabling, the facts are essentially uncontroverted.

Plaintiff was born in 1914. She now resides in Cicero, Illinois, with her husband, whom she married in 1935. Plaintiff did not complete her first year of high school and, except for an unfinished typing course, had no vocational training. She has had three jobs: as an assembly line riveter for Chicago Flexible Shaft Co. from 1937 to 1946; as a material cutter for Sears Roebuck in 1952 and 1953; and on an assembly line for Western Electric from 1955 to 1958.[5]

Shortly after starting at Chicago Flexible Shaft, plaintiff's fingers began to trouble her.[6] They became ulcerous, increasingly stiff and difficult to manipulate, especially in cold weather. She sought medical advice, but the doctors were unable to diagnose her affliction. Plaintiff's fellow employees assisted her at work, but ultimately the company informed her that she would have to leave because she was physically unable to do her job.[7]

While unemployed between 1946 and 1952, plaintiff did some light housework. But her fingers were irritated by tasks such as dishwashing, and occasionally her condition would "flare up." When plaintiff started to work at Sears, she believed her condition had improved; however, she could work neither continuously nor effectively. She had difficulty grasping scissors and "worked at a much slower pace than the other girls." Her illness caused her to leave Sears in 1953.

Plaintiff's doctors continued to treat her, but still were unable to determine the cause of her difficulties. Her discomfort increased. When she was upset or exposed to the cold, her feet and hands became numb and pallid. She also developed painful swelling of her fingertips and tightness of the skin on her upper arms and chest. Nevertheless, in 1955 she went to work for Western Electric. Plaintiff's first assignment was on the assembly line tightening screws. However, she was unable to use a screwdriver effectively and was soon transferred. Her next assignment required that she dip her hands, covered by cellophane, into an acetone solution. As a result, plaintiff's fingers were

---

5. Plaintiff's highest annual earnings at Chicago Flexible were $2,664 in 1945. At Sears her total earnings were only $744.81. At Western Electric she achieved her highest gross earnings ($4,200) in 1956, but her earnings declined in 1957 and amounted to only $484.85 in 1958.

6. The affidavit of Jeanette Neu, who worked with plaintiff at Chicago Flexible, states:
   When I met her [Bernice Stark] in 1938 she stated that something was wrong with her hands and that she had that condition for two years. . . . Her difficulties with her hands progressed as the years went on. It involved her fingers which were stiff and which were hard to move and as time went on she could not hold things. In cold weather her fingers would puff up, burst and fluid would run out. This would occur in other weather but cold weather affected her the worst.

   During her last two or three years at Flexible her problems with her hands made it extremely difficult for her to work.

   Mrs. Neu went on to state that plaintiff's co-workers would have to "cover for her so she could keep her job which she was trying so hard to do" and that "she could do so little of value" the company finally asked her to leave. Essentially the same facts were set forth in the affidavit of Patricia Bshara, who also worked with plaintiff between 1937 and 1946. Mrs. Bshara, however, further noted that plaintiff "would be in pain from the condition of her hands."

7. Plaintiff testified that, but for the job market created by World War II, the company would have terminated her employment sooner. *Compare* Orzel v. Finch, 445 F.2d 150, 153–154 (7th Cir. 1971).

greatly irritated and her condition deteriorated.[8] In March of 1957 she entered the University of Illinois Research and Educational Hospital, where her condition was diagnosed as Raynaud's phenomenon.[9]

Plaintiff remained in the employ of Western Electric until January 10, 1958. She was finally discharged because she could not perform the required work satisfactorily. While at Western Electric she had a high absence rate, was in great pain when she worked and received a good deal of assistance from her co-workers. The administrative law judge concluded that "her attempts to work resulted from severe economic need."

In 1960 plaintiff reentered the Research and Educational Hospital. Her condition was diagnosed as scleroderma accompanied by Raynaud's phenomenon. Between 1960 and 1971 plaintiff was admitted to the hospital on five separate occasions. She complained of progressive hardening and tenseness of the skin on various parts of her body, difficulty in swallowing, increasing inability to move her fingers and wrist, ankle edema, weight loss, and an asymptomatic mass in her left breast. On some occasions plaintiff would state that certain of these symptoms gave her less trouble than in the past. Nevertheless, her general condition became progressively worse.

In 1971 plaintiff was examined and found to be asthenic, diaphoretic and cyanotic. One plus pitting edema was noted in the extremities, and her hands evidenced demonstrable tapering and mild atrophy. Tests further revealed an infarction and occlusion of arteries. The final diagnosis was arteriosclerotic heart disease, scleroderma in remission and recurrent thromboembolism. Since scleroderma is progressive, fatal and without cure, it is doubtful that plaintiff's condition will ever improve. She has undergone some surgery and, for the most part, is now confined to bed.

## II.

The Secretary's initial contention is that plaintiff failed to prove, as required by 42 U.S.C. § 423(d)(1)(A), that she: (A) suffered from a medically determinable physical impairment; and (B) by reason of this impairment was unable to engage in any substantial gainful activity. According to the Secretary, we therefore must affirm the decision of the Appeals Council. *See* Kirkland v. Weinberger, 480 F.2d 46, 49 (5th Cir. 1973).

### A.

42 U.S.C. § 423(d)(3) provides that a "physical or mental impairment" is

an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

The purpose of this section is to make clear that statements by a claimant or mere conclusions of others as to the nature and extent of an impairment are in-

---

8. The details of plaintiff's employment at Western Electric were set forth in her testimony before the administrative law judge and in an affidavit of Leona Leo, a co-worker at this company. Mrs. Leo stated:

Finally she [plaintiff] was asked to leave, or just could not carry on. From observing her with her pain and problems I do not know how she kept on even at the pace she was limping along at. It was not her physical being that kept her working, it was "pure guts." I believe she badly needed the money.

Mrs. Bshara, a co-worker at Chicago Flexible, kept in contact with plaintiff through her term at Western Electric. Mrs. Bshara corroborated the testimony of plaintiff and Mrs. Leo.

9. Raynaud's phenomenon is a vascular disorder marked by recurrent spasm of the capillaries, especially those of the fingers and toes. Concomitant symptoms include pallor, cyanosis and redness in succession, numbness and pain. The symptoms are usually most pronounced during cold weather. In severe cases, the disease may lead to local gangrene.

sufficient. There must be acceptable medical evidence that such an impairment existed. S.Rep.No. 744, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. & Admin.News. pp. 2834, 2882–2883; 20 C.F.R. §§ 404.-1501(c) & 404.1523 (1973). The Secretary argues that there is no medical evidence establishing plaintiff's suffering from scleroderma prior to 1951; therefore, plaintiff failed to prove a "physical impairment."

Plaintiff was unable to produce the medical records of the three doctors who treated her during the late 1940's and early 1950's. She explained that her records had been destroyed in a flood, that two of the doctors had long since been deceased and that the third doctor could not be located. The administrative law judge himself made an unsuccessful effort to find the records of these doctors. Plaintiff, however, did submit the medical reports of the University of Illinois doctors who treated her after 1957. A 1957 report contains a diagnosis of Raynaud's phenomenon; a 1960 report, scleroderma. She also submitted an affidavit of Dr. Adolph Rostenberg, Jr., who followed plaintiff's condition "for many years." Based upon his contact with plaintiff and the affidavits prepared by plaintiff's coworkers at Flexible Shaft, Dr. Rostenberg concluded: "[I]t appears to me that Mrs. Stark's scleroderma was present in and from the late 1930's."

The Secretary offered no medical opinion contradicting Dr. Rostenberg's. *Compare* Williams v. Finch, 440 F.2d 613, 615–616 (5th Cir. 1971). Furthermore, the medical authorities cited by plaintiff and the administrative law judge are consistent with this opinion. They establish that the onset of scleroderma is insidious and its progression slow; while its cutaneous manifestations may, on occasion, regress, the disease nevertheless follows its fatal course. Raynaud's phenomenon, pain, ulcerations and increasing tightness of the skin are all associated with the disease in its initial, as well as subsequent, stages. Finally, the University of Illinois reports contained in the record are also consistent with this opinion.[10]

■ A medical opinion does not become unacceptable, for purposes of § 423(d)(3), simply because it is based upon a claimant's symptomology, Bittel v. Richardson, 441 F.2d 1193 (3d Cir. 1971), or upon medical records and lay testimony. *See* Kyle v. Cohen, 449 F.2d 489 (4th Cir. 1971). It is also clear that a diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment. Berven v. Gardner, 414 F.2d 857, 861 (8th Cir. 1969); Murphy v. Gardner, 379 F.2d 1, 7 (8th Cir. 1967). We thus conclude that Dr. Rostenberg's affidavit is predicated upon a "medically acceptable clinical diagnostic technique" and that, when considered in light of the entire record, it establishes the existence of a "physical impairment" prior to 1951.

### B.

■■ A claimant is "unable to engage in substantial gainful activity" only if he satisfies the requirement of 42 U.S.C. § 423(d)(2)(A).[11] To meet

---

10. When plaintiff had herself admitted to the University of Illinois Hospital in 1957, her condition was diagnosed as "not scleroderma." In 1960, however, the doctors found that scleroderma was present, and in 1962 they concluded that it had been present even before the 1957 diagnosis. The manifestations of scleroderma often show signs of regression. Thus, it is possible that the 1957 and 1962 diagnoses do not conflict on the issue of whether scleroderma was present when plaintiff first entered the hospital. In any event, if there was a conflict, it was resolved in favor of the plaintiff by the administrative law judge. He determined that scleroderma was present, but that it was in remission. The Secretary did not dispute this determination.

11. Section 423(d)(2)(A) provides in part that the individual's impairment must be of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experi-

his burden under this section, a claimant must demonstrate that his impairment is so severe that he is no longer able to perform the kind of work in which he has been engaged. If that showing is made, the burden shifts to the Secretary to prove that there is available some other kind of "substantial gainful employment" which claimant is able to perform.[12]

Prior to 1951, plaintiff's only job had involved working with her hands on an assembly line operation. If she established that her impairment was sufficiently severe to prevent her from continuing to work in that capacity on December 31, 1950, she met her burden and it was incumbent upon the Secretary to prove the availability of alternate employment. Since the record in this case is devoid of any such proof by the Secretary, he is necessarily contending that plaintiff's impairment was not sufficiently severe prior to December 31, 1950, to prevent her from working with her hands.

The uncontroverted medical, as well as lay, evidence before us clearly refutes such a contention. There is no cure for scleroderma. One medical authority, who was cited by the administrative law judge, concluded:

> Patients with slowly progressive systemic sclerosis can lead productive and useful lives. The most important goal in therapy is to preserve function in and prevent injury to the hands. Vocational and/or climatic change may be indicated. Hand care must be stressed, including instructions for active and passive exercises to prevent flexion contracture. Early signs of local infection in fingertips must be treated immediately before they progress to large ulcerations.
>
> C. Loeb, Textbook of Medicine 813 (13th ed. 1971). Under this medical evidence it is clear that, for a person who works only with his hands, scleroderma should be considered disabling before the disease reaches its most advanced and crippling stages.[13]

In 1950 plaintiff had already been afflicted with this progressive, insidious disease for over 10 years. At that time, according to the medical evidence in the record, the proper treatment of the disease required her to stop working with her hands in such a way as would irritate them. Unfortunately, her affliction was not properly diagnosed until 1960; she did not thereafter return to work. We have no doubt that a correct diagnosis in 1951 would have revealed the need to avoid work of the kind she had been performing. Since the record demonstrates beyond challenge that her activities as an assembly line worker resulted in severe irritation of her fingers, and since the "most important goal in therapy" of scleroderma is to "prevent injury to the hands," we conclude that

---

ence, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

12. Hernandez v. Weinberger, 493 F.2d 1120, 1122–1123 (1st Cir. 1974) ; DePaepe v. Richardson, 464 F.2d 92, 100–101 (5th Cir. 1972) ; Meneses v. Secretary of Health, Education and Welfare, 143 U.S.App.D.C. 81, 442 F.2d 803, 806–808 (1971) ; Garrett v. Finch, 436 F.2d 15, 18 (6th Cir. 1970) ; Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968).

13. The Secretary correctly contends that the mere onset of a disease does not normally establish a disability; the question is when did the disease become of disabling severity. It is clear, however, that a disease may become this severe without actually reaching its most advanced and crippling stages. E. g., Martin v. Secretary of Dept. of Health, Education and Welfare, 492 F.2d 905 (4th Cir. 1974). Such is the present case.

Of course, even if the onset of a disease makes it impossible for a claimant to continue his former employment, he is not necessarily entitled to benefits; the Secretary need only adduce evidence of other employment possibilities. See note 12 *supra* and accompanying text. As we have already indicated, the Secretary adduced no such evidence in this case.

on December 31, 1950, the disease made her "unable to do [her] previous work" within the meaning of § 423(d)(2)(A).

Under a purely literal reading of the statute, plaintiff was "able" to do work which could only aggravate a malignant, progressive illness. We do not believe, however, that Congress enacted a rule of law which imposes any such duty upon its intended beneficiaries.

### III.

The Secretary's second contention is based upon three items of evidence adverse to plaintiff's claim: (1) certain medical records placed the onset of her illness in about 1954; (2) on her application for benefits she stated that she first became unable to work in 1958; and (3) she was employed after 1950. The Secretary argues that this evidence is substantial support for the determination of the Appeals Council; therefore, under our narrow scope of review,[14] we must affirm.[15] It is, however, our duty to appraise this evidence in light of the entire record and not merely to view it "in isolation."[16] When viewed in this manner the facts upon which the Appeals Council relied are not substantial.

A fair reading of the medical records of the University of Illinois Research and Educational Hospital belies the suggestion that the onset of scleroderma did not occur until 1954. Some of plaintiff's complications were not noticed until 1954,[17] but others, such as the ulcerations, which were a primary cause of her disability, clearly were. We have no doubt, as found by Dr. Rostenberg and the administrative law judge, that her scleroderma was present while she was employed at Chicago Flexible prior to 1946.

■ Nor do we regard the admission in plaintiff's application as controlling. In her answer to the question when she became unable to work because of her disability, she stated: "Dec. not the first 1958." This answer is ambiguous because it is not clear whether she meant that December, 1958, was "not the first" time she became unable to work, or that she could not remember the specific date when she left Western Electric, but it was "not the first of December."[18] We think the latter interpretation is the more reasonable, but nevertheless do not consider this admission critical. When plaintiff completed the application she knew she had worked at Western Electric in 1958 and, since she was not represented by counsel, was unaware of the earnings requirement that made it necessary for her to establish an earlier disability date. She simply stated the fact that she was not totally unable to work until 1958. That

---

14. We must, of course, affirm the Secretary's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g); Bartell v. Cohen, 445 F.2d 80, 82 (7th Cir. 1971). However, this does not mean that

> the findings of the administrative agency must be blindly accepted. On the contrary, the statutorily-granted right of review contemplates more than an uncritical rubber stamping of the administrative action.

Byrd v. Richardson, 362 F.Supp. 957, 959 (D.S.C.1973).

15. As the Secretary correctly suggests, the fact that plaintiff satisfied her burden of proof is not dispositive of this appeal. If there is substantial evidence supporting the decision of the Appeals Council, we may not substitute our judgment for its.

16. *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 477–487, 71 S.Ct. 456, 95 L.

Ed. 456, which pages are specifically cited with approval in Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842.

17. The Appeals Council relied upon on a 1957 report where it is stated: "About 3 years ago . . . [plaintiff] noted numbness and tingling in her feet and hands . . . ." As indicated in note 1 *supra*, as well as by the medical authorities which are part of this record, the complications associated with scleroderma are several; not all of these complications necessarily appear at the same time.

18. Actually, it was the 10th of January, 1958. Since over 13 years had elapsed, plaintiff may have been thinking of December, 1957, when she completed the application.

statement added nothing of legal significance to the evidence that she had in fact been employed both at Sears and at Western Electric after December 31, 1950. *See* Cook v. Ribicoff, 202 F.Supp. 558, 559 (S.D.Tex.1962). The difficult issue in this case, which the admission in her application merely highlights, is whether that post-1950 employment constitutes substantial evidence of non-disability as of December 31, 1950.

■ Unquestionably the regulations provide a basis for concluding that plaintiff's employment during the period in which she claims to have been disabled is disqualifying.[19] But it is clear that each case must be decided on its own facts,[20] and post-disability employment is not necessarily disqualifying in every case.[21] The question is not simply answered by the fact of employment or the extent of her earnings. Rather, the answer turns on whether she was disa-

bled within the meaning of the Act notwithstanding the fact that she actually did work.

The uncontroverted evidence demonstrates that plaintiff worked only because she desperately needed the money; was transferred from one department to another because of her condition; needed the assistance of her co-workers to perform; had a high absence rate; worked in great pain; received the criticism of her foreman, and was finally fired, because she could not satisfactorily perform her job without assistance. Of greatest significance is the medical evidence which indicates that, if her condition had been properly diagnosed, she almost certainly would have been advised to discontinue work which could only aggravate a progressive incurable disease. Although neither she nor her doctors was fully aware of the extent of her disability while she was struggling

---

19. 20 C.F.R. § 404.1532(a) (1973) provides in part that, if an individual works during any period in which he alleges he was under a disability, such employment may demonstrate that he was not in fact disabled. Furthermore, 20 C.F.R. § 404.1534(b) (1973) provides that an individual's earnings from work activities averaging in excess of $140 per month shall, under certain circumstances, establish no disability. These regulations are apparently implementations of 42 U.S.C. § 423(d)(4).

20. The Secretary also relies upon our decision in Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970). In *Kutchman* this court stated:

> Since disability claims invoke a fact-finding process upon the basis of the evidence presented in support of the particular claim, it is always questionable whether the invasion by a court of the bog of comparative case analysis serves any useful purpose. Extended analysis of those cases is not, therefore, undertaken.

425 F.2d at 23.

Notwithstanding this admonition it is perhaps appropriate to note that, in *Kutchman,* the claimant had worked on a substantially full-time basis with a perfect attendance record. She also performed her work in a satisfactory manner without assistance, and was actually working after the time that the Secretary had initially found her disabled.

21. Cox v. Cohen, 321 F.Supp. 534, 536–538 (N.D.Cal.1971); McGaha v. Ribicoff, 262

F.Supp. 161 (D.Del.1966); *see* Orzel v. Finch, 445 F.2d 150 (7th Cir. 1971).

By its terms, § 404.1534(b) is inapplicable where the individual's work establishes that he "does not have the ability to engage in substantial gainful activity under the criteria in §§ 404.1532 and 404.1533 and . . . [404.1534(a)]." Section 404.1532(d) provides in part:

> The adequacy of an individual's performance of assigned work is also evidence as to whether or not he has ability to engage in substantial gainful activity. . . . [A]n individual's failure, because of his impairment, to perform ordinary or simple tasks satisfactorily without supervision or assistance beyond that usually given other individuals performing similar work, may constitute evidence of an inability to engage in substantial gainful activity.

Section 404.1533 implies that a claimant may not have engaged in substantial gainful activity where he, "because of his impairment, is unable to spend as much time in work activities as is customarily spent by individuals without impairment in similar work . . . ." Section 404.1534(a) provides in part: "Where an individual is forced to discontinue his work activities after a short time because his impairment precludes continuing such activities, his earnings would not demonstrate ability to engage in substantial gainful activity."

to maintain her earnings because of her "severe economic need," we think it is now apparent that, at all times after 1950, her affliction was sufficiently serious to be disabling within the meaning of the Act.

## IV.

We recognize the force of the argument that, even though we differ with the Secretary's appraisal of the evidence, we may not substitute our judgment for his as long as the evidence supporting the denial is substantial and that, in this case, it is not unreasonable to characterize plaintiff's post-1950 employment as substantial. Normally proper procedure might dictate a remand to receive expert testimony directed specifically at the question whether, having the benefit of later known symptoms, medical opinion would regard plaintiff as having been physically unfit to perform the work which she actually did perform after 1950. For three reasons, however, we decline to pursue that route.

First, as already stated, the uncontradicted evidence now in the record provides an affirmative answer to that question; we may not qualify that answer by discounting the testimony of a witness whom the administrative law judge saw, heard and credited. Second, since the claim only involves the period since 1971, and since the cost to both parties of further evidentiary hearings, with the possibility of still another appeal, is so disproportionate to the amount at stake, there is good reason to bring the proceedings to an end as expeditiously as possible. And finally, in view of the impossibility of determining with complete accuracy the extent of plaintiff's affliction over two decades ago, the settled policy of construing the statute favorably to the claimant [22] leads

us to the result that seems manifestly just under all the circumstances.[23]

We therefore reverse the decision below with instructions to enter judgment for the plaintiff.

Reversed.

PELL, Circuit Judge (dissenting).

There can be no disagreement that the sad plight of the claimant in the present appeal is capable of arousing a high degree of sympathy. However, because I am unable to agree that the majority opinion correctly reflects the applicable law, I feel compelled to record this dissent.

The district court concluded as a matter of law that the plaintiff had the burden of showing that she was under disability on or before December 31, 1950. This was the crucial date and there appears to be no disagreement that the burden of proof was on the claimant.

The district court further concluded as a matter of law that there was substantial evidence in the administrative record to support the finding of the Appeals Council.

Here I would expect to find that I was verging from the result reached by the majority opinion. However, that opinion recognizes explicitly that "we may not substitute our judgment for [the Secretary's] as long as the evidence supporting the denial is substantial and that, in this case, it is not unreasonable to characterize plaintiff's post-1950 employment as substantial." Nevertheless, the judgment of the district court is reversed with a direction to enter judgment for the plaintiff.

The result appears to have been reached on the basis of medical opinion in the administrative record as well as certain equitable considerations which I do not find to have been encompassed in the statutory scheme.[1] As to the

---

22. See cases cited by Judge Sprecher in his dissenting opinion in Bledsoe v. Richardson, 469 F.2d 1288, 1293 (7th Cir. 1972).

23. For the second and third reasons we also do not remand to determine plaintiff's potential for other employment, see note 12 *supra* and accompanying text, after 1950.

*See also* Bartell v. Cohen, 445 F.2d 80, 83–84 (7th Cir. 1971).

1. I do not disagree with the statement in the majority opinion that it is settled policy to construe the statute favorably to the claimant; however, such a policy does not to me mean that mere eligibility under the statute

medical opinion, aside from the question that the majority opinion appears to be weighing this evidence and finding it more persuasive than the admittedly substantial evidence on which the Secretary relied, I do not find support in the record for the crucially determinative question.

Dr. Rostenberg concluded that the scleroderma was present in and from the late 1930's. This, however, is not the crucial question. The fact that a person was suffering from a diagnosed disease or ailment at a particular time is not sufficient in the absence of proof of its disabling severity to warrant the award of benefits. Henry v. Gardner, 381 F. 2d 191, 195 (6th Cir. 1967), cert. denied, 389 U.S. 993, 88 S.Ct. 492, 19 L. Ed.2d 487. I find no medical opinion that the disease was of sufficient severity as to have rendered the claimant disabled on or before December 31, 1950.

The "substantial evidence" of employment adverted to in the majority opinion appears to me to be dispositive of the issue on this appeal. Just looking at the Western Electric employment alone, I note the following earnings: 1955, $2,556.26; 1956, $4,200.00; 1957, $4,114.93; and 1958, $484.85. The wages received during this period from March 8, 1955 to January 10, 1958 [2] were the highest she had ever earned. I am unable to equate this earnings record and what it represents in terms of gainful employment on an assembly line with an "inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment," which is the definition of disability. 42 U.S.C. § 423(d).

The plaintiff attempts to explain her ability to continue working by stating that she was helped by her co-workers. She also indicated, however, that she worked as a part of a group and the pay depended upon group production. It is conceivable that sympathetic co-workers will help an ailing comrade, but when this lasts over a three-year period with the pay of those in the group, also presumably "bread-earners," being constantly diminished, it is understandable if the Secretary, in evaluating the evidence, viewed with some skepticism a claim that during the period in question the claimant was unable to engage in substantial gainful activity.

The claim of help by the co-workers at Western Electric was supported by the affidavit of one fellow employee of that plant who told of the difficulties experienced by the claimant during her work at the plant. The affidavit states that the claimant had a heavy rate of absence. The claimant's own affidavit states she "was absent *usually* at least two half days a week." (Emphasis added.) The co-worker's affidavit also states, "I believe that she said that she was getting some medical help. She was weak and co-workers had to help her with her work . . . . Her co-workers tried to help her."

Ordinarily great deference should be given to the credibilty determinations made by the tribunal actually hearing the case. Here the administrative law judge found in favor of the claimant. However, substantially all of the evidence was in affidavit or similar form and the interpretation and inferences to be given to it and drawn from it were before the Appeals Council. The courts should not redetermine the facts de novo. Myers v. Richardson, 471 F.2d 1265 (6th Cir. 1972). Our only inquiry is to determine whether the Secretary's findings of fact are supported by substantial evidence. Even if the court should be of the opinion that documenta-

---

should be transmuted into a prevailing claim. Likewise, the fact that the claim is relatively small compared to litigation costs, being a case that private litigants would probably settle, is no basis for making bad law.

2. The plaintiff testified as to the Western Electric employment: "I have the exact dates here. I started March 8, 1955 and on January 10, 1958 they let me go."

While $484.85 would ordinarily be more than she would have earned in the first ten calendar days of a year, the record is silent as to matters such as severance pay and accrued vacation compensation.

ry evidence can be reinterpreted by us, here the evidence fails to support a determination that the claimant met the disability requirement prior to 1951.

In sum, this court is presented with a pathetic story, one which has great appeal to compassionate understanding, and one which involves relatively insignificant sums of money in today's inflationary context. But this court is also presented with a case which requires the application of established rules of law. While I do so less than happily, considering the circumstances of this hapless individual, I nevertheless feel compelled to come down on the side of the rule of law. At the very least, this court should do no less than remand for the receipt of expert testimony as to whether the plaintiff was disabled prior to 1951 which thus far has not been demonstrated in the record to the extent that it requires this court to reverse and direct the entry of judgment for the plaintiff.